IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| D'WAN LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act. No.: 2:17-cv-407-ECM |
| | ) | (WO) |
| MONTGOMERY FITNESS, INC., | ) | |
| d/b/a PLANET FITNESS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

Before the Court is the Defendant's motion for summary judgment (doc. 42), which has been fully briefed. (Docs. 43-44; Brief and Evidence); (Docs. 47 and 49; Responsive Brief and Evidence); (Doc. 53; Reply). After careful consideration and for the reasons that follow, the Court concludes that the Defendant's motion for summary judgment is due to be granted.

**I.     Jurisdiction and Venue**

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Personal jurisdiction and venue are uncontested.

**II.     Standard of Review**

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

1

law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED.R.CIV.P. 56(a)). "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

### III. Background.

Montgomery Fitness, Inc., operating under the name Planet Fitness in Montgomery, Alabama, provides gym and health club services. The general manager, Heath York, a white male, handles the day-to-day operations, including hiring, firing, and discipline. Plaintiff D'wan Lewis, an African-American male, was hired by York on April 15, 2015 to work at the front desk. Front desk duties require a significant amount of computer work. Lewis struggled with the front desk responsibilities and within a few months of employment, he asked York to move him to a position that did not require computer work. York obliged and moved Lewis to a maintenance and cleaning position, and Lewis made no objection to this transfer.

In August of 2015, Lewis overheard a conversation between co-workers Katherine Ross, a white female, and Kijuan Jones, a black male, during which Ross used the term "nigger." Jones reported the incident to York, and York investigated the matter. As part of the investigation, York interviewed Lewis. Roth admitted using the racial slur, and York terminated her that same day. Lewis never heard any of his supervisors use racially-derogatory language, and Roth's use of the slur was the only time he ever heard this type of language used at work.

On September 1, 2015, a member of the gym complained that Lewis had sexually harassed his sixteen-year-old granddaughter. York investigated the

3

allegation. The child's mother reported that Lewis retrieved the child's personal information from the gym's computer and spoke to her daughter using sexual language. Although Lewis denied the accusations, York found them to be credible and documented the incident.

On December 10, 2015, Lewis received a write-up for failing to check off his daily cleaning tasks. The following day, on December 11, 2015, Lewis received a write-up for failing to refill paper towel dispensers and for exhibiting a bad attitude. Although the entire gym staff was responsible for changing out the paper towels, Lewis was the only maintenance worker on staff at the time and he could not recall whether the paper towels were replaced.

In addition to the misconduct documented by write-ups, York claims to have received undocumented complaints from gym members about Lewis socializing on the job. On December 15, 2015, York met with Lewis to discuss his job performance. At the end of the meeting, York terminated Lewis. On the associated Employee Warning Notice Form, York wrote that Lewis "failed to meet performance requirements," that Lewis stated that "he did not need his job," and that Lewis "possessed a careless attitude." Lewis claims he was terminated because York said Lewis wasn't happy. Lewis further claims that after his investigative interview with York, he was assigned additional job duties, such as cleaning under

4

treadmills and dusting the lockers, and that his work overall was subjected to higher scrutiny.

The day Lewis was terminated, Roth called the gym and asked for her job back. The gym was short-staffed at the time, so York conferred with the gym's third-party HR/payroll company and the only remaining employee who worked at the gym during Roth's use of the racial slur, an African-American woman named Mary Sloan. York asked Sloan how she would feel about working alongside Roth again after the incident, and Sloan indicated that she had no problem with Roth being rehired. Thereafter, York met with Roth, who acknowledged her wrongdoing, apologized, and assured York that it would never happen again. York rehired Roth; however, she resigned about a month later for unrelated reasons.

Lewis claims he was treated less favorably than two white co-workers, Lane Buford and Katy Roth. Lewis alleges that Buford, who was late for work several times, was moved to another shift instead of being terminated. However, the undisputed evidence establishes that Buford received a write-up each time he was late, and that York never moved Buford to another shift or otherwise accommodated him. Buford voluntary left his job to enter the military—an arrangement that was understood from the beginning of his employment.

Lewis also claims that he was treated less favorably than Roth. Specifically, he claims that Roth never did much cleaning, and she was never disciplined for her

5

failure to do so. Additionally, he takes issue with York's rehiring of Roth. In drawing his comparison, Lewis asserts that both he and Roth were hired as front-desk employees and earned the same wage. Lewis points out that when he was moved to the maintenance position, his duties still overlapped with Roth's because front-desk employees have some responsibility for cleaning. However, front-desk employees only had minor cleaning responsibilities while the large majority of their responsibilities involve computer work. At all material times, Lewis was a maintenance worker, whose primary responsibility was cleaning. Throughout her employment, Roth worked at the front desk.

Lewis claims that he suffered discrimination and retaliation in violation of 42 U.S.C. §1981. He further brings a state-law claim against Montgomery Fitness for negligent and/or wanton hiring, training, supervision, and retention.

## IV. Analysis.

Lewis bring two claims under 42 U.S.C. §1981: race discrimination and retaliation. Specifically, Lewis claims he was terminated because of his race. He further claims that he suffered retaliation after opposing the use of a racial slur by a co-worker.

### A. 42 U.S.C. § 1981 Race Discrimination.

Pursuant to 42 U.S.C. §1981, "[a]ll persons…shall have the same right…to make and enforce contracts…as is enjoyed by white citizens…." *Monds v. Quitman*

*Ga.*, --- Fed.Appx. ----, 2019 WL 1422819, *2 (11th Cir. March 29, 2019). The law is clear that "a plaintiff asserting an intentional-discrimination claim under Title VII of the Civil Rights Act of 1964, the Equal Protection Clause, or 42 U.S.C. § 1981 must make a sufficient showing to permit a reasonable jury to rule in [his] favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.5 (11th Cir. March 21, 2019) (en banc). Indeed, the Court "examine[s] claims of discrimination and retaliation under the same legal framework regardless of whether the plaintiff invokes section 1981 or section 2000e [(Title VII)]." *Jefferson*, 891 F.3d at 919; *see also Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes [(Title VII and 42 U.S.C. § 1981)] have the same requirements of proof and use the same analytical framework. . . .").

When a plaintiff, using circumstantial evidence, "assert[s] an intentional-discrimination claim under Title VII of the Civil Rights Act of 1964, the Equal Protection Clause, or 42 U.S.C. § 1981," the *McDonnell Douglas* burden-shifting framework governs the analysis at summary judgment.[1] *Lewis*, 918 F.3d at 1217.

> When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) []he belongs to a protected class, (2) that []he was subjected to an adverse employment action, (3) that []he was qualified to perform the job in question, and (4) that h[is] employer treated similarly situated

---

[1] In their briefs, both parties use the *McDonnell Douglas* burden-shifting framework to analyze Lewis's claims of discrimination. Additionally, neither party suggests that Lewis's discrimination claims are anything but single-motive discrimination. Accordingly, the Court finds that Lewis's discrimination claims involve allegations of single-motive discrimination and that the *McDonnell Douglas* burden-shifting framework applies. *See Lewis*, 918 F.3d at 1220 (applying *McDonnell Douglas* framework to discrimination claim); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 904 F.3d 1226, 1239 (11th Cir. 2018) (same).

> employees outside h[is] class more favorably. . . . If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. . . . Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that []he has been the victim of intentional discrimination.

*Id.* at 1220–21 (internal citations and quotations omitted). In establishing the fourth prong of the *prima facie* case, the plaintiff must point to proper comparators to be used in the analysis, and such comparators must be "similarly situated [to the plaintiff] in all material respects." *Id.* at 1224. This comparison must be worked out "on a case-by-case basis," but ordinarily a similarly-situated comparator: "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and "will share the plaintiff's employment or disciplinary history . . . ." *Id.* at 1227–28.

In the present case, Lewis has not met his initial burden of establishing a *prima facie* case. In his complaint, Lewis identifies three actions that he alleges were motivated by discrimination: Montgomery Fitness's decision to terminate Lewis, Montgomery Fitness's subjecting Lewis to "less favorable terms and conditions of employment," and Montgomery Fitness's "harass[ing] Plaintiff during his time of employment." (Doc. 1, p. 3). The Court construes the "less favorable terms and

8

conditions" and the "harass[ing]" to be York's comments to Lewis about his job performance, including the various warnings Lewis received.

Without addressing whether the underlying facts of these alleged employment actions would even amount to "adverse employment action[s]" for the *prima facie* case, the Court concludes that Lewis fails to offer a suitable comparator. As a result, he has not established a *prima facie* case, and his claims of discrimination fail.

In his response to the motion for summary judgment, Lewis argues that Roth was treated more favorably than he was at work.[2] At the time Lewis was terminated, Lewis and Roth had different job titles and different job duties. Although Lewis alleges that cleaning was part of Roth's job, the evidence establishes that the core functions of Roth's front-desk job involved a significant amount of computer work while Lewis's core job function was cleaning. Lewis alleges that he and Roth were disciplined differently for failing to clean; however, any such disparity makes sense because cleaning was an essential function of Lewis's job but was only tangential to Roth's. Further, Roth had a clean disciplinary record until the time of her termination, whereas Lewis received multiple warnings prior to his termination:

---

[2] While Lewis identifies Lane Buford as a potential comparator in his complaint, *see* (doc. 1, p. 3), Lewis abandons this comparison in his response to the motion for summary judgment, *see* (doc. 47). In any event, the two are not fairly comparable. Buford was a front-desk employee—Lewis was not. (Doc. 49-1, p. 40). Additionally, Buford was not treated less favorably than Lewis. Lewis initially alleged that York treated Buford more favorably by moving him to a new shift in response to his habitual tardiness, as opposed to writing him up. (Doc. 1, p. 3). However, the undisputed evidence shows that Buford received write-ups for being late, then ceased being late entirely after discussions with York. (Doc. 49-1, pp. 40–41). Eventually, Buford voluntary left his job at the gym for military service. *Id.*

several for his attitude and work performance, and one for the alleged sexual harassment of a sixteen-year-old. Although Lewis suggests that Roth was treated more favorably because she was rehired, there is no evidence that Lewis tried and failed to get his job back after his termination. Lewis and Roth are not "similarly situated in all material respects," and accordingly, Lewis's claims fail in the first stage of the *McDonnell Douglas* framework.

Even apart from the strictures of the framework, Lewis has provided no evidence that York discriminated against him on the basis of his race. The only incident implicating race involved Roth, a co-worker, using a racial slur in the workplace. Lewis acknowledges that he never heard a supervisor, or any other employee, use racially-derogatory language. Further, York terminated Roth the same day she used the slur. York only rehired Roth after she called to ask for her job back at a time when the business was short-staffed and after she expressed remorse for her actions. Prior to rehiring Roth, York consulted with HR, consulted with the one remaining employee who used to work with Roth, and conducted a meeting with Roth about the incident, during which she assured York she would not engage in similar behavior again.

In other words, Lewis has not presented a "convincing mosaic of circumstantial evidence that would allow a jury to infer international discrimination

by the decisionmaker."[3] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011)). As such, no inference of intentional discrimination is warranted. However, even when viewing all evidence in Lewis's favor and making all reasonable inferences in Lewis's favor, the Court is left only with evidence of (1) an isolated incident of a co-worker's use of an offensive racial slur, and (2) York's reasonably-different discipline of differently-situated employees.

Accordingly, the motion for summary judgment is granted on all claims of race discrimination brought under 42 U.S.C. § 1981.

### B. 42 U.S.C. § 1981 Retaliation.

The *McDonnell Douglas* burden-shifting framework applies to § 1981 retaliation claims at the summary judgment stage. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 904 F.3d 1226, 1233–34 (11th Cir. 2018) (analyzing Title VII and § 1981 retaliation claims under the *McDonnell Douglas* framework); *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) ("Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under §1981, we employ the tripartite analytical framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green* . . . .").

---

[3] Although Lewis did not assert the "convincing mosaic" theory in any of his pleadings or other filings, the Court considered the evidence under this standard and finds it significantly lacking. *See Connelly v. WellStar Health Sys., Inc.*, --- Fed.Appx. ----, 2019 WL 140823, *3 n.2 (11th Cir. Jan. 9, 2019).

Under this framework, a plaintiff must first establish a *prima facie* case of retaliation. *Gogel*, 904 F.3d at 1233. "A plaintiff establishes a *prima facie* case of retaliation by showing that: (1) []he engaged in statutorily protected activity; (2) []he suffered a materially adverse action; and (3) there was a causal[4] connection between the protected activity and the adverse action." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257–58 (11th Cir. 2012). "An action is materially adverse if it 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 1259 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. But mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal citation omitted). "Once the plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Gogel*, 904 F.3d at 1233 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308

---

[4] There appears to be some uncertainty in this Circuit about the causation standard that a plaintiff must meet as part of the *prima facie* case, i.e., whether a plaintiff must show that his participation in the protected activity was the "but-for" cause of the materially-adverse action or whether the plaintiff need only show that the two events are "not wholly unrelated." *Compare Jefferson*, 891 F.3d at 924 ('but-for'), *and Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016) ("but-for"), *with McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) ("not wholly unrelated"). However, the Court need not make any specific finding regarding the appropriate causation standard here because Lewis's retaliation claims fail to demonstrate a *prima facie* case under both the "but-for" and the "not-wholly-unrelated" standards.

12

(11th Cir. 2009)); *accord Smelter v. Southern Home Case Servs.*, 904 F.3d 1276, 1293 (11th Cir. 2018). "After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Gogel*, 904 F.3d at 1233.

Lewis claims the Defendant retaliated against him for his participation in York's investigation into Roth's use of a racial slur at work. (Doc. 1, pp. 2, 4); (Doc. 47, p. 3). The Court first looks to the *prima facie* case. Lewis claims that the Defendant assigned him additional job duties, including cleaning under treadmills and dusting lockers, and scrutinized his work at a higher level after he engaged in a protected activity. Construing the facts and evidence in Lewis's favor, the Court accepts as true that Lewis engaged in a protected activity when he participated in York's investigation of Roth. The question before the Court is whether these duties and this level of scrutiny are "materially adverse" for the purposes of establishing a *prima facie* case. The Court finds that they are not.

In *Smith v. City of Fort Pierce*, the Eleventh Circuit found that:

> glaring, slamming a door in an employee's face, inquiring into retirement plans, commenting that an employee is not a team player, blaming an employee for failed union negotiations, or harboring concerns over an employee's dependability and trustworthiness are not actions that would dissuade a reasonable worker from making or supporting a charge of discrimination.

565 Fed.Appx. 774, 778 (11th Cir. 2014). Accordingly, the Eleventh Circuit held that those actions were not "materially adverse" for the purposes of establishing a

13

*prima facie* case of retaliation. *Id.* Further, the Supreme Court's reasoning in *Burlington* speaks directly to the issue of "material adversity" in retaliation claims:

> We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights and minor annoyances that often take place at work and that all employees experience.

*Burlington*, 548 U.S. at 68 (internal quotations and citations omitted) (emphasis original).

Lewis's claims have not carried the day. Lewis's additional job duties and heightened scrutiny are certainly less "adverse" than the employer's actions in *Smith*. Further, these minor types of job changes are a normal part of workplace discourse between managers and employees. These are the "petty slights and minor annoyances" that are common workplace situations that do not give rise to a cause of action for retaliation. Accordingly, the Plaintiff failed to make out a *prima facie* case that these actions were retaliatory in nature.

Lewis further complains about York's investigation into a customer complaint that Lewis sexually harassed a sixteen-year-old girl; even further, Lewis takes issue with York's documentation of the event. Although this incident was somewhat close in time to York's investigation of Roth, a manager's investigation into an allegation of sexual harassment of a child and documentation thereof is not a materially adverse employment action. But even if Lewis could make out a *prima facie* case of

14

retaliation for these events, the Defendant clearly articulates a non-discriminatory reason for taking such actions. York was approached by a gym member who claimed that Lewis sexually harassed his sixteen-year-old granddaughter. Further, York observed that the child's mother was in tears. The child's mother told York that Lewis used sexual language, asked the child what she did on weekends, and looked up the child's personal information on the gym's computer. Although Lewis denied the allegations, York's investigation into and documentation of the claims against Lewis are non-retaliatory in nature. Thus, the Defendant has met its burden to "articulat[e] a legitimate, non-discriminatory reason" for counseling Lewis and documenting the event. *See Gogel*, *supra*. Once a defendant does so, the burden shifts back to the plaintiff "to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Id.*

Lewis fails to make such a demonstration. Lewis argues that York's failure to immediately terminate Lewis, for allegations that York believed were true, is somehow evidence of pretext. (Doc. 43, pp. 16–18). Lewis's position seems to be that the Defendant selectively used the alleged sexual harassment episode to support its decision to ultimately terminate Lewis. *Id.* Lewis claims that, at the time this event occurred, he received no punishment for the event, but after his termination, the Defendant used the event as a rationale for terminating him. *Id.* Lewis's logic is fatally flawed. The fact remains that York received a disturbing complaint about

Lewis's sexual behavior towards a child. As a manager, York has the right to believe or disbelieve this information, and his decision to investigate and document the event does not provide the basis for any inference of retaliation. Lewis has not demonstrated that York's actions were pretextual.

Lewis also claims that his write-ups and ultimate termination were retaliatory. Roth's use of the racial slur and the subsequent investigation took place on August 14, 2015. Lewis's final write-ups and termination occurred between December 10, 2015 and December 15, 2015, four months after Lewis's participation in the protected activity. Although temporal proximity between a protected activity and a materially adverse action may, in some cases, establish causation, it does not do so here. *See Thomas*, 506 F.3d at 1364 ("A three to four month disparity between statutorily protected expression and the adverse employment action is not enough.").

Because Lewis's final write-ups and termination were four months removed from his participation in York's investigation of Roth, and Lewis has provided nothing more that suggests these incidents were unlawful retaliation, Lewis has failed to make out a *prima facie* case of retaliation. Accordingly, the Defendant's motion for summary judgment is granted on Lewis's retaliation claims brought under 42 U.S.C. § 1981.

*C. Negligent or Wanton Hiring, Training, Supervision, and Retention.*

Lewis claims that Montgomery Fitness does not conduct anti-harassment training for its employees, and he asserts that Roth's use of a racial slur constituted outrage and harassment, actionable under Alabama law. The Court construes this claim against the Defendant as a claim for failure to train Roth, who allegedly engaged in tortious activity.

In Alabama, the torts of wanton or negligent hiring, training, supervision, and retention are subject to the following principle:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.

*Bedsole v. Clark*, 33 So.3d 9, 15 (Ala. Civ. App. 2009) (quoting *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1003 (Ala. 1993)); *see also Voyager Ins. Cos. v. Whitson*, 867 So.2d 1065, 1073 (Ala. 2003). Of particular importance, these torts are subject to another point of law: "[I]mplicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that *caused* the plaintiff's injury." *Jones Express, Inc. v. Jackson*, 86 So.3d 298, 305 (Ala. 2010) (emphasis original) (citing *Humana Med. Corp. of Ala. v.*

17

*Traffanstedt*, 597 So.2d 667, 669 (Ala. 1992)). "Under Alabama law, the finding of underlying tortious conduct is a precondition to invoking successfully liability for the negligent or wanton training and supervision of an employee." *Smith v. Boyd Bros. Transp., Inc.*, 406 F.Supp.2d 1238, 1248 (M.D. Ala. 2005) (citing *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 824 (Ala. 1999)); *accord Guy v. Ala. Power Co.*, 2013 WL 3929858, *3 (M.D. Ala. 2013); *cf. Calloway v. MetLife Sec., Inc.*, 2018 WL 4909949, *5 (N.D. Ala. 2018) ("[I]f the underlying claims fail, a plaintiff cannot sustain a claim for negligent supervision.").

"In Alabama, the torts of outrage, outrageous conduct, and intentional infliction of emotional distress are the same cause of action." *Patterson v. Augat Wiring Sys., Inc.*, 944 F.Supp. 1509 (M.D. Ala. 1996) (citing *Stewart v. Matthews Indus., Inc.*, 644 So.2d 915, 918 (Ala. 1994)); *see Little v. Consol. Publ'g Co.*, 83 So.3d 517 (Ala. Civ. App. 2011).

> The elements of the tort of outrage are (1) that the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from its conduct; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it.

*Underwood v. City of Bessemer*, 2018 WL 4685461, *17 (N.D. Ala. 2018) (quoting *Jackson v. Ala. Power Co.*, 630 So.2d 439, 440 (Ala. 1993)). "The conduct alleged must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable

in a civilized society." *Shepherd v. Summit Mgmt. Co., Inc.*, 726 So.2d 686, 694 (Ala. Civ. App. 1998) (internal quotation omitted) (affirming trial court's grant of summary judgment on claim of outrage and holding that "the conduct alleged by [the plaintiff] does not rise to the level of conduct required to establish a claim of outrage" where the plaintiff was black and her supervisor told her that "[he] didn't like niggers" and that sometimes his employees "have to be treated like slaves").

Lewis fails to provide meaningful analysis of his state law claim, particularly with respect to the "tort of outrage and harassment." (Doc. 47, pp. 22–23).[5] While Roth's use of the word "nigger" is reprehensible, its single use in these circumstances is insufficient to state a claim for outrage. In *Shepherd*, a supervisor's use of that slur combined with at least one other racially-charged phrase was insufficient to give rise to the tort of outrage. Likewise, Roth's conduct does not give rise to such a claim. Further, under Alabama law, the finding of tortious conduct is a "precondition" to finding supervisor liability in this context. By extension, Lewis's claims for wanton or negligent hiring, training, supervision, and retention fail for lack of underlying tortious conduct. Summary judgment is thus granted on these claims, as well.

---

[5] Although the Court undertakes to analyze Lewis's claim that Roth committed the tort of outrage, Lewis fails to address whether a stand-alone cause of action for "harassment" exists under Alabama law. While the Court is doubtful that it does, the Court declines to conduct an independent inquiry, as the Court has already done more analysis of Lewis's state law claim than Lewis has.

19

## V.     Conclusion.

For the foregoing reasons, it is

ORDERED that the Defendant's motion for summary judgment (doc. 42) be and is hereby GRANTED, and the case is hereby DISMISSED with prejudice. It is further ORDERED that the costs of this proceeding are taxed against the plaintiff. A separate final judgment will be entered in accordance with this order.

DONE this 15th day of May, 2019.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE